# EXHIBIT A

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| COUNTY OF WAKE  2010 DEC 20 AM 9: 35 | SUPERIOR COURT DIVISON |
| LONESOURCE, INC.,  WAKE COUNTY, C.S.C. | 10 CVS _____ |
| Plaintiff, | |
| v. | **COMPLAINT** <br> (Served with Interrogatories and Request for Production of Documents) |
| UNITED STATIONERS SUPPLY CO., | |
| Defendant, | |

Plaintiff Lonesource, Inc. complaining of Defendant United Stationers Supply Co., alleges ands says as follows:

## PARTIES

1. Plaintiff Lonesource, Inc. ("Lonesource") is a corporation organized and existing under the laws of the state of Delaware with is principal place of business located in Cary, North Carolina.

2. United Stationers Supply Co. ("United") is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business located in Deerfield, Illinois and is authorized by the State of North Carolina to conduct business and in fact conducts business in North Carolina.

## JURISDICTION AND VENUE

3. This is an action for damages for declaratory relief, breach of contract, anticipatory breach of contract, fraud, interference with a prospective economic advantage, and unfair and deceptive trade practices. Subject matter jurisdiction over this cause in conferred upon and vested in this Court pursuant to N.C. Gen. Stat. §1-253.

4. Personal jurisdiction over United is conferred upon and vested in this Court pursuant to N.C. Gen. Stat. 1-75.4.

5. Venue for this cause is properly laid in this Court pursuant to N.C. Gen. Stat. 1-77, 1-79, 1-80 and 1-82.

## FACTS

6. Lonesource is a national consolidated supplier of corporate consumables headquartered in Cary, North Carolina. Lonesource sells not only office supplies, but also IT and data supplies, paper, office furniture, and print and promotional products. (hereinafter collectively referred to as "Goods").

7. In order to service its customers Lonesource typically has maintained a contractual relationship with a wholesaler of Goods wherein the wholesale supplier acts as the primary supplier of Lonesource.

8. Prior to September 1, 2008, Lonesource's primary supplier was a wholesaler that is not a party to this action. ("Third-Party-Wholesaler").

9. In or about July 2008, Lonesource was in the process of acquiring a larger competitor, Sun Belt Office Products, LLC ("Sun Belt") located in Norcross, Georgia. The acquisition of Sun Belt doubled the size of Lonesource.

10. Because of its pending acquisition of Sun Belt, Lonesource was able to negotiate a new contract with the Third-Party Wholesaler, whereby among other things the Third-Party Wholesaler agreed to pay Lonesource a certain amount in conversion funds.

11. Prior to its acquisition by Lonesource, Sun Belt's primary source of Goods was defendant United.

12. Prior to Lonesource's acquisition of Sun Belt, Jim Anderson, the president of Sun Belt, informed Mike Rohl of United that Sun Belt was being sold to Lonesource.

13. Upon being informed of the pending sale of Sun Belt, Mike Rohl contacted Brad King, the president and CEO of Lonesource and asked what United could do to keep the business it had with Sun Belt and also get Lonesource's existing business.

14. The day after Lonesource's acquisition of Sun Belt, Cody Phipps, the president of United called Brad King to tell him that United wanted all of Lonesource's business. Brad King informed Mr. Phipps that he was willing to speak with United and that if they wanted to make a proposal they should act quickly.

15. Although Lonesource acquired Sun Belt on June 30, 2008 it did not plan on converting Sun Belt over to the Third-Party Wholesaler until September 2008.

16. On July 23, 2008, Cody Phipps and Pat Collins of United travelled to Cary, NC to meet with representative of Lonesource. At that time they told Brad King that United wanted to understand Lonesource's business and vision. Cody Phipps also asked Brad King what a deal would have to look like in order to get Lonesource to move its wholesale purchases to United.

17. At the meeting in Cary on July 23, 2008, Brad King outlined to United the cost of Goods structure and the conversion funds that it would take to move Lonesource's business to United. At the conclusion of the meeting, United indicated they would work on it.

18. Shortly after the July 23, 2008 meeting, United requested data from Lonesource to perform some modeling so they could come up with terms that would be acceptable to them.

19. At the request of United, Lonesource provided United with data including but not limited to: (a) identification of items Lonesource was buying; (b) breakdown of business in terms of what was wrap and label vs. drop ship; (c) spend by categories of Goods; and (d) breakdown

of geographic region by customers. As United already had this information concerning Sun Belt's business, the data Lonesource supplied related mainly to its existing business units prior to its acquisition of Sun Belt.

20. Lonesource provided United with all data it requested. After the data was provided, Lonesource answered all questions asked of it by United.

21. The conversion from one wholesaler to another is an expensive and time consuming process for Lonesource. While Lonesource knew that it would either have to convert Sub Belt to the Third-Party Wholesaler or Lonesource to United, it did not want to convert Sun Belt to the Third-Party Wholesaler and then subsequently convert all of its business back to United. Accordingly, its stalled Sun Belt's conversion to the Third-Party wholesaler until it knew where negotiations were going with United.

22. On or about August 1, 2008 Lonesource and United verbally agreed to terms whereby United would become the primary wholesaler to Lonesource.

23. Between August 1, 2008 and August 6, 2008, Lonesource and United worked on drafting the language of the contract. Cody Phipps was United's primary representative in drafting the contractual language.

24. In a conference call that took place in early August, 2008 where the parties were negotiating certain language related to pricing, Pat Collins, a senior United executive, stated "let's get the deal done and United can figure out how to make money later."

25. As of August 6, 2008 the parties had agreed to the written terms of the Contract and announced internally Lonesource's decision to switch its business to United. At or about that time, Lonesource and United entered into a contract, effective September 1, 2008 whereby Lonesource agreed to use United as its Primary Supplier. ("the Contract"). .

26. As part of the Contract United made certain promises to Lonesource, including but not limited to:

    a. Lonesource would receive quarterly rebates at the percentages and for the certain Goods identified in the Contract and that no minimum order size was required for rebates;

    b. That there would be no small order charges on any size or order;

    c. That there would be no wrap and label delivery charges;

    d. That it would provide paper per prices attached as Exhibit C to the Contract;

    e. Pricing for all goods would be per the terms of the Contract.

27. As a result of the representations made to Lonesource, Lonesource terminated its relationship with the Third-Party Wholesaler and paid back the conversion funds previously provided by the Third-Party Wholesaler.

28. Almost immediately upon execution of the Contract and Lonesource's termination of its relationship with the Third-Party Wholesaler, representatives of United began demanding that changes to the Contract be made so that it would be more beneficial to United. Specifically, within two weeks of executing the Contract, Larry Miller, a senior executive of United, was on site at Lonesource's Cary, North Carolina headquarters and informed Stacey King, Lonesource's Executive Vice President and COO, that the parties needed to rewrite the Contract to put it in language that worked for United. Stacey King informed Larry Miller that since the CEOs of each company had negotiated and executed the Contract Lonesource would not rewrite the Contract.

29. After the conversation with Larry Miller above, representatives of United, in almost every conversation they had with representatives of Lonesource, complained about the profitability of the Contract and stated the need of United to redo the Contract.

30. In December 2008, Cody Phipps and Brad King had a telephone call to discuss Lonesource's 2009 acquisition plans. In that call, Cody Phipps indicated that he would like for Brad King to meet the Chairman of United but that the profitability of the Contract for United was so embarrassingly low that he would not invite Brad King up to Chicago until changes were made in the Contract.

31. One of Lonesource's customers was Rent-A-Center, a company which primarily purchased paper from Lonesource. In early 2009 United began complaining that Rent-A-Center's business was not profitable for United and requested that Lonesource cease doing business with Rent-A-Center. Despite Rent-A-Center's business being profitable to Lonesource, Lonesource agreed to United's request in order to attempt to maintain a good working relationship with United.

32. Even though Lonesource essentially fired Rent-A-Center at United's request, United continued to complain to Lonesource that the Contract was not profitable for United and that the Contract needed to be modified.

33. On or about October 26, 2009, Cody Phipps and Jeff Howard travelled to Cary North Carolina in an attempt to get Lonesource to agree to modify the Contract. Mr. Phipps indicated that in order to make the Contract profitable to United, Lonesource needed to agree to, among other things: (a) a new freight plan that would shift costs to Lonesource, and (b) eliminate or reduce the rebates provided in the Contract.

34. Also at the October 26, 2009 meeting, United also continued to complain that Lonesource was ordering too much paper. United further complained that many of the orders for paper were for one carton making the cost of shipment of paper unprofitable to United. This trend was consistent with Lonesource's historical sale of paper prior to entering into the Contract and could have been ascertained from the data Lonesource provided to United prior to the execution of the Contract.

35. During the October 26, 2009 meeting, United gave Lonesource three alternatives with respect to paper:

    a. Purchase less paper;

    b. Agree to a price increase for paper and shipment; or

    c. Find an alternative source for paper.

36. As a result of United's position regarding Lonesource's purchase of paper, Lonesource began exploring purchasing paper directly from the manufacturer so that it could provide its customers with a Lonesource branded paper.

37. Plaintiff is informed and believes that United became aware that Lonesource was seeking alternative sources of paper as United had suggested it do. As a result, representatives of United informed Lonesource that they would be willing to sell paper to Lonesource for its private brand. When United presented its proposal to sell Lonesource paper for its private brand the cost was significantly higher than the prices set forth in the Contract. As a result, Lonesource informed United it would continue to look elsewhere, as initially suggested by United.

38. The manufacturers of paper are the operators of paper mills such as Domtar, Inc. and International Paper.

39. Manufacturers of paper, or paper mills, sell paper through brokers/distributors. This is true regardless of whether the paper is sold directly to a retailer or to a wholesaler. Brokers/distributors that represent manufacturers are not considered wholesalers within the industry or under the Contract.

40. In or about November 2009 Lonesource began discussions with the Enterprise Group, the sales/distribution division for Domtar, Inc. and agreed upon pricing for paper. After discussions with the Enterprise Group, Lonesource was confident that it could purchase paper and sell it under its own brand name.

41. Sometime near the final stage of negotiations with the Enterprise Group, the Enterprise Group informed Lonesource that they could not sell paper to Lonesource as Domtar, Inc. (their parent company) had a channel conflict. At that time the Enterprise Group did not identify the channel conflict.

42. United purchases its paper from Domtar, Inc. through the Enterprise Group. Plaintiff is informed and believes that the amount of paper by volume and value that United purchases from Domtar, Inc. through the Enterprise Group is significant.

43. Plaintiff is informed and believes that representatives of United pressured the Enterprise Group and Domtar, Inc. to not sell paper to Lonesource.

44. On or about August 26, 2010 and after the Enterprise Group refused to sell paper to Lonesource, representatives of the Enterprise Group travelled to Cary, North Carolina to meet with representatives of Lonesource in an attempt to get Lonesource's business that it had previously refused. In this meeting Lonesource inquired about the channel conflict that had previously prevented Lonesource from purchasing paper from Domtar, Inc. through the Enterprise Group. Mike Spath, the Group Vice President for the Enterprise Group, indicated that

there was no channel conflict and that this had been an excuse. Brad King asked Mr. Spath directly whether United had requested that the Enterprise Group/Domtar, Inc. not sell paper to Lonesource and his response was yes.

45. After deeming United's price too high, Lonesource contacted Athens Paper, a distributor for International Paper. Thereafter, Lonesource entered into an agreement whereby it would purchase paper from International Paper, through its distributor, Athens Paper.

46. As a result of having to purchase its paper through Athens Paper as opposed to the Enterprise Group, Lonesource has to pay $1.00 per carton more for paper.

47. Even though Lonesource was purchasing its private branded paper through a broker/distributor it continued to use United as its primary supplier as that term is defined in the Contract as Lonesource continued to purchase 70% of its total monthly office products and at least 95% of its total monthly wholesale office products from United.

48. After Lonesource informed United that, as United suggested, Lonesource would purchase paper for its private brand elsewhere, United continued to complain about the profitability of the Contract and continued to demand that Lonesource agree to modify the terms. The modifications requested include those set for in paragraphs 33 & 34 above, in addition to new pricing for paper and technology products. By this time United was threatening Lonesource that their relationship would not continue unless Lonesource agreed to the changes United was demanding.

49. If United unilaterally terminated its relationship with Lonesource and stopped supplying Lonesource with Goods, the financial impact on Lonesource would be catastrophic.

50. On or about March 26, 2010, Rebo Sullivan of Lonesource sent Brian Cusick of United a proposed amendment to the Contract whereby Lonesource would agree to changes in

the Contract regarding shipping and the pricing of paper so long as Lonesource was given an opportunity to purchase its Technology Products elsewhere.

51. United never commented on or signed the proposed amendment. However, despite not signing or agreeing to the amendment and despite Lonesource not executing the same, United unilaterally raised the pricing on paper and freight as if the document had been executed.

52. On or about September 1, 2010, United informed Lonesource that the Contract was terminated because Lonesource had purchased paper from another wholesaler.

53. United's termination of the Contract was wrongful in that United remained Lonesource's primary supplier as that term is defined in the Contract.

54. After United informed Lonesource that the Contract was terminated it informed Lonesource that it could not continue to provide Goods at the prices set forth in the Contract as the Contract was not profitable for them.

55. United has informed Lonesource that unless it agrees to terms significantly different than those set forth in the Contract it will stop supplying Goods to Lonesource.

56. In order to mitigate its damages, after United terminated the Contract, Lonesource was forced to renew its relationship with the Third-Party Wholesaler prior to United making good on its threats to stop supplying Goods to Lonesource unless Lonesource agreed to terms different than those contained in the Contract.

57. While the pricing and terms reached with the Third-Party Wholesaler are not as advantageous as set forth in the Contract with United, they are better than those being demanded by United in order to continue supplying Lonesource.

58. Lonesource has complied with all conditions precedent to the bringing of this action.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment)

59. Plaintiff realleges and incorporates by reference paragraphs 1-58 of its Complaint as if fully set forth herein.

60. There is a substantial controversy between the parties as to whether Lonesource breached the Contract and Lonesource is entitled to a declaration that it has not breached the Contract.

61. Litigation as to the respective rights of the parties under the Contract appears unavoidable and, therefore an action for Declaratory Judgment is appropriate under N.C. Gen. Stat. § 1-253 et seq.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

62. Plaintiff realleges and incorporates by reference Paragraphs 1-61 of its Complaint as if fully set forth herein.

63. United's unilateral termination of the Contract prior to the expiration of its term constitutes a material breach of the Contract.

64. United's action of unilaterally changing the pricing of paper and freight charges constitutes a material breach of the Contract.

65. United has breached the Contract in other ways to be shown at the trial of this matter.

66. As a result of United's breach of the Contract, Plaintiff has been damaged in an amount in excess of $10,000.00, said amount to be shown at the trial of this action.

## THIRD CLAIM FOR RELIEF
(Anticipatory Breach of Contract)

67. Plaintiff realleges and incorporates by reference paragraphs 1-66 of its Complaint as if fully set forth herein.

68. United's actions and statements described herein, including but not limited to its termination of the Contract and its statements that it will no longer sell Goods to Lonesource pursuant to the terms set forth in the Contract constitute a repudiation of its obligations under the Contract such that it has anticipatorily breached the Contract.

69. As a result of United's anticipatory breach and repudiation of the Agreement, Plaintiff has been damaged in an amount in excess of $10,000.00.

## FOURTH CLAIM FOR RELIEF
(Fraud)

70. Plaintiff realleges and incorporates by reference paragraphs 1-69 of its Complaint as if fully set forth herein.

71. United, by entering into the Contract promised and represented to Plaintiff among other things that:

   a. Lonesource would receive quarterly rebates at the percentages and for the certain Goods identified in the Contract and that no minimum order size was required for rebates;

   b. That there would be no small order charges on any size or order;

   c. There would be no wrap and label delivery charges;

   d. That it would provide paper per prices attached as Exhibit C to the Contract;

   e. Pricing for all goods would be per the terms of the Contract.

72. Plaintiff is informed and believes that at the time United entered into the Contract the representations and promises described above were false in that United did not intend to honor the terms and conditions stated above.

73. Plaintiff is informed and believes that United made the representations described above for the purpose of inducing Plaintiff to terminate its relationship with the Third-Party Wholesaler knowing that once the conversion to United took place it would have leverage to renegotiate the Contract.

74. The representations of United were made with the intent to deceive and were reasonably calculated to deceive.

75. Plaintiff was deceived by and reasonably relied upon the representations of United to its detriment by executing the Contract and terminating its relationship with the Third-Party Wholesaler.

76. The false representations and promises of United have proximately caused damage to Lonesource in an amount in excess of $10,000.00 the exact amount to be shown at the trial of this matter.

## FIFTH CLAIM FOR RELIEF
(Interference with Prospective Economic Advantage)

77. Plaintiff realleges and incorporates by reference paragraphs 1-76 of its Complaint as if fully set forth herein.

78. But for the conduct of United, Lonesource would have entered into a contractual relationship whereby Lonesource would have purchased paper from Domtar, Inc. through its broker/distributor the Enterprise Group.

79. United had knowledge of Lonesource's prospective entry into a contract to purchase paper from Domtar, Inc. through its broker the Enterprise Group.

80. United, without legal justification and with a design to injure Lonesource or to gain an advantage at Lonesource's expense, induced the Enterprise Group and Domtar, Inc. not to sell paper to Lonesource.

81. As a result of United's interference with the prospective contractual relationship between Lonesource and Domtar, Inc./Enterprise Group, Lonesource has suffered damages in excess of $10,000.00, the exact amount to be shown at the trial of this matter.

**SIXTH CLAIM FOR RELIEF**
**(Unfair and Deceptive Trade Practices)**

82. Plaintiff realleges and incorporates by reference, paragraphs 1-81 of its complaint as if fully set forth herein.

83. The actions of United as alleged herein were unfair and/or deceptive.

84. The actions of United were in or affecting commerce.

85. The unfair and deceptive acts of United have proximately caused damage to Plaintiff in an amount in excess of $10,000.00, the exact amount to be shown at the trial of this matter.

86. The damages caused by United's unfair and deceptive trade practices should be trebled pursuant to N.C. Gen. Stat. 75-16.

WHEREFORE Plaintiff prays the Court that:

1. The Court declare that Plaintiff is not in default of the Contract pursuant to its First Claim for Relief;

2. It have and recover an amount in excess of $10,000.00 pursuant to its Second Claim for Relief;

3. It have and recover an amount in excess of $10,000.00 pursuant to its Third Claim for Relief;

4. It have and recover an amount in excess of $10,000.00 pursuant to its Fourth Claim for Relief;

5. It have and recover an amount in excess of $10,000.00 pursuant to its Fifth Claim for Relief;

6. It have and recover an amount in excess of $10,000.00 pursuant to its Sixth Claim for Relief and that these damages be trebled pursuant to N.C. Gen. Stat. 76-16 ;

7. That it be awarded punitive damages for the conduct alleged in its Fourth and Fifth Claim for Relief;

8. That the costs of this action be taxed against United;

9. That Lonesource be awarded its reasonable attorneys fees pursuant to N.C. Gen. Stat. 75-16.1.

10. For a trial by jury on all issues so triable;

11. For such other and further relief as the Court deems just and proper.

This the 20 day of December, 2010.

SHIRLEY & ADAMS, PLLC

By: /s/ A. Graham Shirley
A. Graham Shirley
N.C. State Bar No.: 16052
150 Fayetteville Street
Suite 520
Raleigh, NC 27601
Tel: (919) 899-6278
Fax: (919) 899-6279
*Attorneys for Plaintiff*

10CV020910

# STATE OF NORTH CAROLINA

File No.
10-CV-

WAKE County

In The General Court of Justice
☐ District ☒ Superior Court Division

Name of Plaintiff
LONESOURCE, INC.

Address
c/o Shirley & Adams, PLLC, 150 Fayetteville Street, Ste. 520

City, State, Zip
Raleigh, NC 27601

## CIVIL SUMMONS

☐ Alias and Pluries Summons

G.S. 1A-1, Rules 3, 4

**VERSUS**

Name of Defendant(s)
UNITED STATIONERS SUPPLY CO.

Date Original Summons Issued

Date(s) Subsequent Summon(es) Issued

**To Each of The Defendant(s) Named Below:**

Name And Address of Defendant 1
United Stationers Supply Co.
by and through its registered agent
Corporation Service Company
327 Hillsborough Street
Raleigh, NC 27601

Name And Address of Defendant 2

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

Name And Address of Plaintiff's Attorney (If None, Address of Plaintiff)
A. Graham Shirley
Shirley & Adams, PLLC
150 Fayetteville Street, Suite 520
Raleigh, NC 27601

Date Issued: 12-20-10   Time 9 ☐ AM ☐ PM
Signature
☒ Deputy CSC  ☐ Assistant CSC  ☐ Clerk of Superior Court

☐ ENDORSEMENT

This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days.

Date of Endorsement   Time   ☐ AM ☐ PM
Signature
☐ Deputy CSC  ☐ Assistant CSC  ☐ Clerk of Superior Court

**NOTE TO PARTIES:** Many Counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.

AOC-CV-100, Rev. 10/01
© 2001 Administrative Office of the Courts
(Over)

| | RETURN OF SERVICE | |
|---|---|---|

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM  ☐ PM | Name of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM  ☐ PM | Name of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to person named below.

Name And Address of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason.

| Service Fee Paid $ | Signature of Deputy Sheriff Making Return |
|---|---|
| Date Received | Name of Sheriff (Type or Print) |
| Date of Return | County of Sheriff |

AOC-CV-100, Side Two, Rev. 10/01
© 2001 Administrative Office of the Courts